Filed 7/31/25  P. v. Bennett CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRYANT BENNETT,<br><br>    Defendant and Appellant. | B327373<br><br>(Los Angeles County<br>Super. Ct. No. BA446441) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Shelly Torrealba, Judge.  Affirmed.

David W. Scopp, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

After using methamphetamine for five consecutive days without sleep, 44-year-old Bryant Bennett stabbed 63-year-old Cheryl Tyler to death. Bryant appeals from a judgment of conviction for second degree murder, contending the court erred by failing to hold a second competency hearing to update its finding, made two years prior, that he was competent to stand trial and by failing to instruct on heat of passion manslaughter. He also contends that the prosecutor committed prejudicial misconduct, and he requests that we review the transcript of a *Pitchess* hearing on the possible bias of three investigating police officers to determine whether the court abused its discretion by failing to release relevant records.[1]

We conclude the court did not err by declining to hold a second competency hearing or to instruct on heat of passion manslaughter, and further conclude the prosecution committed no prejudicial misconduct. Accordingly, we affirm the judgment. Additionally, after reviewing the transcript of the in-camera *Pitchess* hearing we find no abuse of discretion.

## BACKGROUND

The pertinent facts are undisputed. Bennett and Tyler shared an apartment in Los Angeles. On April 9, 2016, Bennett, who had been using methamphetamines for five consecutive days without sleep, stood in the apartment complex courtyard in the rain for several hours, unresponsive to attempts by tenants to communicate with him. Police were called and found a sheathed knife with an eight-inch blade in Bennett's waistband. They

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 532.

handcuffed him and then went to the apartment, where they found Tyler, who had been stabbed 14 times, dead.

## A.     Bennett's Delusions and Mental Health Evaluations

Bennett was charged with murder and initially pleaded not guilty by reason of insanity, a plea he later changed to simply not guilty.

During the preliminary hearing on October 17, 2016, Bennett interrupted the prosecutor's direct examination of a police officer, demanding, "Leave me alone"; "Leave me the fuck alone." The court observed that no one had been touching, speaking to, or making any gestures toward him. Bennett's counsel reported that back in the holding area, Bennett was nonresponsive when she attempted to speak with him, making statements that had nothing to do with her questions. The bailiff reported Bennett was generally nonresponsive and screamed that he heard voices in his head. The prosecutor and court observed that this behavior was of recent advent, as Bennett had appeared responsive and competent during proceedings four days earlier. The court declared a doubt as to Bennett's competency to stand trial and ordered a mental health evaluation under Penal Code section 1368.1.[2]

Bennett was evaluated four times over the next two years to determine his need for psychiatric treatment, competence to stand trial, and ability to represent himself.

---

[2] Undesignated statutory references are to the Penal Code.

3

### 1. Dr. Rad, 2017

In March 2017, Dr. David S. Rad, M.D., reported that Bennett had a history of delusions, paranoia and use of psychiatric medications, and had told him that " 'God revealed' to him that he was Jesus" by causing stars, clouds and UFOs to follow him. Dr. Rad found that Bennett suffered only from a stimulant-use disorder, not a psychopathology that could impair his ability to understand the nature of the criminal proceedings. Bennett knew he had been charged with murder and stated the victim had been his friend. He knew that she was stabbed to death, that the charges were serious, and the consequences could include prison. Bennett believed the role of the judge and court personnel were to "judge" him, stating of the judge, "why else would they call him a judge?" He also thought that the role of the district attorney was to judge him and that his defense attorney was not independent because the judge and defense counsel were "being paid by the same hand."

Dr. Rad reported that Bennett's demeanor was serious and his affect constricted but reactive to the topics being discussed. He was able to discuss his mental health history cogently and responsively and became purportedly confused and nonresponsive only when the topic turned to his competency to stand trial, an inconsistency that suggested pretense.

Dr. Rad opined that "while Mr. Bennett may have suffered from psychosis in the past, his current presentation was inconsistent with genuine psychosis, and more consistent with malingered psychosis." He found the nature of Bennett's current presentation of psychosis was atypical, as were his attempts to draw attention to his deficits, the absence of objective findings of

4

genuine psychosis, and the lack of collateral data supporting genuine psychotic presentation or disorder.

For example, although Bennett reported visual hallucinations of such things as UFOs, clouds, angels and stars, such dramatic visualizations are atypical of genuine psychosis. And although he reported hearing voices, Bennett could not specify their age or gender, which was atypical. Dr. Rad found that Bennett made efforts to draw attention to his hallucinations and to highlight his claimed deficits, both of which efforts were atypical of genuine psychosis. Dr. Rad reported that although Bennett reported a psychiatric history of mental illness, no collateral observations confirmed these reports—for example there were no reports of him talking to himself or appearing distracted—and his medical records reflected only a series of brief emergency room visits for physical complaints and distress associated with loss of housing, with no resulting psychiatric diagnoses or treatments.

Dr. Rad concluded that Bennett reported psychiatric events that were inconsistent, atypical, and uncorroborated by independent observation; fabricated his psychiatric history to portray himself as mentally ill; and selectively feigned incompetence when the topic turned to his ability to understand trial proceedings, all of which suggested he was malingering psychosis. Dr. Rad opined Bennett was able to assist in his defense in a rational manner if he chose to do so.

Based on this report, the court found Bennett competent to stand trial.

### 2. Dr. Markman

In a June 21, 2017 motion to appoint a medical expert, defense counsel declared: "Mr. Bennett has expressed a firm and unwavering belief that he is Jesus Christ."

In July 2018, Dr. Ronald Markman, M.D., assessed Bennett to determine his "sanity . . . at the time of the alleged offense . . . his current psychiatric condition and his need for treatment and or hospitalization." Dr. Markman reported that Bennett had a history of long-term methamphetamine abuse, use of psychotropic medications, and psychiatric hospitalizations. He opined that Bennett demonstrated no underlying psychotic process or thought disorder but suffered from paranoid disorder secondary to methamphetamine abuse, adjustment disorder with anxious and depressed moods, and personality disorder with antisocial, impulsive, and dependent features. Dr. Markman reported that Bennett had stated he used methamphetamine "earlier that week—went to the apartment—afraid of being stabbed with a knife—roommate was yelling and screaming— thought she was attacking me." Dr. Markman found "no clinical data that would support an insanity defense . . . , as [Bennett] had the ability to appreciate the wrongfulness of his actions and to distinguish between right and wrong, notwithstanding his substance abuse."

### 3. Dr. Knapke, November 2018 Report

On August 15, 2018, Bennett submitted a handwritten letter to the court in which he discussed his delusions and addictions. He stated: "The defendant understands that the so-called alien phenomenon is taboo to talk about but we must now break the silence. Millions of lives are at stake and they won't go

away.  Please hear me.  The fires that we are experiencing will only get worse.  The fires are going to hit the inner cities as well.  They are the cause of the so-called brush fires, sink holes[,] dying marine life, global warming, hurricanes, earthquakes, tornadoes, heat wave[s], water droughts, pestilence, plagues[,] etc.  [¶] Before they manifest[ed] themselves to me[,] I had gone through a lot of suffering . . . .  People tried to kill me, my mom was killed, my family dispersed, my people rejected me and scorned me and law enforcement followed me and harassed me everyday.  It would be this affliction that would prepare me for my meeting with them.  I wanted so bad to leave this world that I would have, even if it meant flying away on the back of a winged 8 legged monster.  [¶]  They have shown me a lot of things[,] and I'm sure they don't want me to keep them to myself.  We are endangered, please help me! . . . .  I don't know why they chose me. . . .  I never wanted to hurt anyone."

Bennett submitted another handwritten letter, dated August 20, 2018, in which he stated he was "the one who the world had been waiting for."  He had visions of clouds and angels, and believed he would "ascend" and go through a "transfiguration."  He further believed that Tyler was "in on the plot to kill him," and stated, "I just lost my mind that morning."

In September 2018, Bennett was assessed by Dr. Kory Knapke, M.D., to determine whether he suffered from a major mental illness, understood the nature of the crime he was charged with, and knew that stabbing Tyler was morally wrong.

In November 2018, Dr. Knapke reported that during the interview, Bennett "was calm and cooperative and . . . also logical and coherent in his thought processes."  He "presented himself

7

very well during th[e] interview," he "voic[ed no] overt delusions," and "his thoughts were organized and tight."

Dr. Knapke reported that Bennett claimed he started having paranoid, delusional thoughts as early as 2007. Following his release from prison in 2014, Bennett started using methamphetamine again, which can cause long-term or permanent psychotic symptoms that can mimic schizophrenia and bipolar mania, including paranoia and delusions. He believed stars and clouds were following and guiding him and angels were descending onto him. He believed he was Jesus Christ and the "one who the world had been waiting for," for which people wanted to kill him. Suffering these delusions, Bennett had committed himself to the Harbor UCLA Hospital, where he stayed for three days.

Dr. Knapke reported that Bennett, who claimed he had been paranoid and actively used methamphetamine for several years prior to the crime, "believed that the victim was trying to kill him . . . and . . . described her as being very hostile towards him on the day of the instant offense. At one point, the victim knocked the knife out of his hand[,] and he then retrieved it and stabbed the victim multiple times." Dr. Knapke reported Bennett was experiencing a drug-induced psychosis when he killed Tyler. Despite Bennett's delusional claims, Dr. Knapke stated there were "no other signs or symptoms of any current psychosis, [and] it is unknown whether [his] claim about believing that he is Jesus is authentic or not."

Dr. Knapke stated that the psychoses Bennett claimed usually began to manifest themselves in the late teens or early 20s, resulting in a lifelong history of psychiatric treatment

services, but there was no evidence that Bennett had that type of history.

### 4. Dr. Knapke, February 2019 Report

Dr. Knapke interviewed Bennett a second time in February 2019 to address whether he was competent to represent himself. He reported that Bennett's statements during this interview "were very consistent" with the statements he made during the September 2018 interview. Dr. Knapke reported that Bennett "continue[d] to harbor grandiose and persecutory delusions," and wanted to represent himself in order to tell the jury he was Jesus Christ, for which the victim and others had been trying to kill him. Dr. Knapke reported that although Bennett claimed he continued to see angels and stars following him because he was Jesus Christ, and was infused with the Holy Spirit and undergoing a transfiguration, he "was not responding to any internal stimuli and appeared to be able to focus on th[e] examination." Dr. Knapke reported, "The defendant feels he needs to make this known during his trial and he does not believe any of the attorneys or doctors involved in his case believe him that he is Jesus Christ." Dr. Knapke observed that these statements were consistent with the statements Bennett made during the September 2018 evaluation. He concluded Bennett was unable to represent himself at trial.

In sum: In March 2017, Dr. Rad opined Bennett was competent to stand trial; in June 2017, Dr. Markman found no clinical data that would support an insanity defense; in 2018, Dr. Knapke found no evidence and no history of psychosis; and in 2019, Dr. Knapke found that Bennett was unable to represent

9

himself at trial. None of the three evaluators concluded Bennett was incompetent to stand trial.

Defense counsel nevertheless requested that the court declare that a doubt existed as to whether Bennett was competent to stand trial. The court declined to do so, finding that although Bennett was incompetent to represent himself, he was competent to stand trial.

## B.    Trial

At trial, Bennett admitted he killed Tyler but claimed that he did so in imperfect self-defense while under the influence of methamphetamines.

Dr. Vadims Poukens, a deputy medical examiner in the Los Angeles County Department of the Coroner, testified that Tyler suffered 14 stab wounds, several being more than five inches deep and seven of which were potentially fatal.

Bennett testified that on April 3, 2016, he began a five-day drug binge in celebration of his 44th birthday, during which he smoked methamphetamine while Tyler smoked crack cocaine and methamphetamine. As a result of his suffering from methamphetamine-induced paranoia, he missed a hearing to receive a Social Security disability payment that he had promised to share with Tyler. When she learned he could not pay her, Tyler became upset and "hostile," slamming doors, throwing dishes into the sink, and deliberately bumping into Bennett. Bennett testified he went out to the apartment courtyard to wait for her to "cool off," where he remained from April 5 to April 9, with only infrequent, brief visits to the apartment to see whether she was still upset. While in the courtyard he saw stars ascending and descending upon him and clouds forming various

10

UFOs, including one that looked like a giant purple pumpkin with a menacing face.

Bennett testified that when he went back to the apartment the final time, Tyler punched him in the head from behind, knocking his glasses off, and struck him four or five more times "pretty hard," yelling "You stupid motherfucker. You gonna get me kicked out of my apartment." When Bennett hit her back, Tyler "drew" Bennett's knife "from somewhere," whereupon he "took her to the floor and . . . wrestled the knife out of her hand."

Tyler "somehow . . . got on top of [Bennett] and had [him] pinned down," however, and tried to "gouge out" his eyes. Because she was too heavy to dislodge, Bennett stabbed her in the buttock.

When asked why he stabbed Tyler to "get her off" him, Bennett replied, "I just wanted her off me. . . . I believe that she was—I didn't want her to gouge out my eyes and be blind or possibly, you know, kill me or anything like. I was just fearful." Bennett testified that the first stab wound "didn't phase" Tyler, "like she didn't feel it or anything, she still remained over me." He testified that because she continued attacking and he "just wanted her off" him, he stabbed her several more times, even though he did not want to hurt her.

After the fight, Bennett testified, he wiped the knife clean on the carpet, sheathed it, and went back to the courtyard, anticipating that a UFO would rescue him. Bennett testified he had not slept in a week, "couldn't really . . . think," and "had never been that high before . . . ."

Bunia Mae Watts, Bennett's ex-girlfriend, testified that Tyler "always needed" to use a walker and a cane, and before the

11

incident Bennett started carrying a knife and displayed bizarre and paranoid behavior.

A deputy medical examiner testified Tyler was 63 years old when she died. She was five feet six inches tall and weighed 235 pounds. Tyler was stabbed 14 times, and seven of the inflicted injuries were fatal or potentially fatal.

A police officer testified that Bennett, who was five feet eleven inches tall and weighed around 205 pounds, had no observable injuries when he was arrested.

Homicide Detective Oscar Villarreal testified that he saw Bennett in a holding cell just before he was booked at the jail. He was lying down with his eyes closed. Detective Villarreal opined that Bennett appeared to be pretending to sleep. Villarreal, accompanied by two other detectives, attempted to interview Bennett but he gave no response to their questions.

Dr. Ryan O'Connor testified that prolonged use of methamphetamine and crack cocaine can cause side effects such as paranoia, delusions, and psychosis, which can be permanent.

During closing argument, Bennett's counsel argued Bennett acted in imperfect self-defense when he killed Tyler because "he honestly believed he needed to use deadly force but he was wrong about it, it was unreasonable for him to do it given the circumstances." Counsel argued, "She's 63 year[s] old, she has bad knees, he could have pushed her away, he could have done things other than what he did. But he acted unreasonabl[y] given the circumstances. His actions were irrational given the circumstances." Counsel did not argue that Bennett killed Tyler in a heat of passion.

The court instructed the jury on imperfect self-defense as follows: "The difference between complete self-defense and

12

imperfect self-defense depends on whether the defendant's belief and the need to use force was reasonable.  The defendant acted in imperfect self-defense if one, the defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; and two, the defendant actually believed that the immediate use of deadly force was necessary to defend against that danger; but three, at least one of those beliefs was unreasonable. . . .  In evaluating the defendant's beliefs, consider all the circumstances as they were known to appeared to the defendant."  The court instructed the jury, "[Y]ou may not consider evidence of the defendant's voluntary intoxication in determining whether the defendant . . . believed it was necessary to act in self-defense . . . ."

Defense counsel did not request heat of passion instructions or attempt to argue that theory to the jury.  The jury convicted Bennett of second degree murder and found true that he used a weapon (a hunting knife) to commit the murder.  The trial court sentenced him to 16 years to life in prison.

## DISCUSSION

Bennett contends the trial court erred by declining to hold a second competency hearing and by failing to instruct on a heat-of-passion manslaughter theory.  He also contends the prosecutor committed prejudicial misconduct and requests that we review the trial court's *Pitchess* proceedings.

## A.    Denial of a Second Competency Hearing

Bennett contends the court erred by failing to order a second competency evaluation after Dr. Knapke, reporting on his

13

second evaluation of Bennett, stated that Bennett "continue[d] to harbor grandiose and persecutory delusions." We disagree.

### 1. Legal Principles

A defendant is incompetent to stand trial who lacks a rational and factual understanding of the proceedings or a sufficient ability to consult with his or her attorney with a reasonable degree of rational understanding. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 464.) Federal and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent. (*Ibid.*)

Section 1368 sets out the conditions under which a trial court must suspend trial proceedings and conduct a competency hearing. In short, " ' "a trial judge [must] suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. [Citations.] . . . Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations." ' " (*People v. Sattiewhite*, *supra*, 59 Cal.4th at p. 464.) When faced with conflicting evidence regarding competence, the trial court's role under section 1368 is not to resolve the conflict but to decide whether the evidence supporting incompetence is substantial. (*People v. Rodas* (2018) 6 Cal.5th 219, 234 (*Rodas*).) "Resolution must await expert examination and the opportunity for a full evidentiary hearing." (*Ibid.*)

If, after a defendant has been found competent to stand trial, new evidence casts serious doubt on the validity of the

14

finding or a substantial change of circumstances occurs, the trial court must suspend proceedings and hold a new competency hearing under section 1368.  (*Rodas*, *supra*, 6 Cal.5th at p. 234 [new competency hearing required when defendant started speaking incoherently following cessation of medication]; *People v. Tejeda* (2019) 40 Cal.App.5th 785, 795 [new competency hearing required when defendant could no longer keep delusion separate from defense]; *People v. Easter* (2019) 34 Cal.App.5th 226, 243 [new word-salad symptom necessitated another competency proceeding].)  This duty to suspend proceedings and conduct another hearing "is not triggered by information that substantially duplicates evidence already considered at an earlier, formal inquiry into the defendant's competence; when faced with evidence of relatively minor changes in the defendant's mental state, the court may rely on a prior competency finding rather than convening a new hearing to cover largely the same ground."  (*Rodas*, at pp. 234-235; *In re Sims* (2021) 67 Cal.App.5th 762, 783.)

"Counsel's assertion of a belief in a client's incompetence is entitled to some weight.  But unless the court itself has declared a doubt as to the defendant's competence, and has asked for counsel's opinion on the subject, counsel's assertion that his or her client is or may be incompetent does not, in the absence of substantial evidence to that effect, require the court to hold a competency hearing."  (*People v. Mai* (2013) 57 Cal.4th 986, 1033.)

We review for substantial evidence a trial court's finding of no substantial change of circumstances or no new evidence casting serious doubt on the validity of an initial competency determination.  (*People v. Huggins* (2006) 38 Cal.4th 175, 220.)

15

We review for an abuse of discretion the court's decision not to reinstate competency proceedings.  (*People v. Marshall* (1997) 15 Cal.4th 1, 33.)  A "trial judge's decision not to order a competency hearing is entitled to great deference, because the trial court is in the best position to observe the defendant during trial."  (*People v. Mai, supra*, 57 Cal.4th at p. 1033.)

### 2.     Application

#### a.     Dr. Knapke's 2019 Report did not Cast Serious Doubt on the 2017 Competency Finding

Bennett argues that Dr. Knapke's February 2019 finding that Bennett "continued" to harbor grandiose and persecutory delusions demonstrated that his delusions were consistent and therefore sincere, which constituted new evidence that undermined Dr. Rad's 2017 conclusion that Bennett was malingering, which in turn cast serious doubt on the court's 2017 competency finding.  We disagree.

Dr. Rad reported in March 2017 that although Bennett had a history of claimed paranoia and delusions, including that God revealed to him that he was Jesus Christ by causing UFOs, stars, and clouds to follow him, he was merely malingering psychosis, and was competent to stand trial.  Based on this report, the court found him competent.

None of the three subsequent evaluations offered anything new.  In July 2018, Dr. Markman reported that Bennett demonstrated no underlying psychotic process or thought disorder.  This tracked Dr. Rad's conclusion that Bennett was malingering psychosis.

16

In November 2018, Dr. Knapke reported that despite Bennett's delusional claims, there were "no other signs or symptoms of any current psychosis, [and] it is unknown whether [his] claim about believing that he is Jesus is authentic or not." This duplicated Dr. Rad's finding that none of the expected collateral observations, for example of Bennett talking to himself or appearing distracted, corroborated his claim that he suffered even from delusions, much less psychoses. Dr. Knapke further stated that the psychoses Bennett claimed usually began to manifest themselves in the late teens or early 20s, resulting in a lifelong history of psychiatric treatment services, but there was no evidence that Bennett, who was 46, had such a history. This duplicated Dr. Rad's finding that Bennett's medical records reflected only a series of brief emergency room visits for physical complaints and distress associated with loss of housing, not any psychiatric diagnoses or treatments.

In February 2019, Dr. Knapke interviewed Bennett a second time, and reported that Bennett made statements "very consistent" with the statements he had made during the first interview indicating that he "continue[d] to harbor grandiose and persecutory delusions." But Dr. Knapke reported that Bennett "was not responding to any internal stimuli" during the interview, and "appeared to be able to focus on th[e] examination." This finding substantially duplicated Dr. Rad's finding that the expected collateral indicia of Bennett's claimed psychoses were absent.

Bennett argues that his long history of mental health issues and bizarre statements provided the "objective findings" and "collateral data" that Dr. Rad had found lacking in 2017,

17

which cast doubt on his conclusions and thus on the court's 2017 competency finding. We disagree.

Dr. Rad reported that objective findings of Bennett's psychosis were lacking because no medical records supported his claims about his psychiatric history, as they reflected only brief emergency room visits for physical complaints and distress associated with loss of housing, with no resulting psychiatric diagnoses or treatments. Nothing in Dr. Knapke's 2019 report improved this record.

Dr. Rad found that collateral data of psychosis was lacking because no collateral observations confirmed Bennett's reports of hallucinations. For example, there were no reports of him talking to himself or appearing distracted during the interview. Nothing in Dr. Knapke's 2019 report provided the missing data. On the contrary, Dr. Knapke too found "no other signs or symptoms of any current psychosis."

That Bennett continued to evince delusions and claim he suffered from hallucinations, substantially duplicated evidence provided by Dr. Rad in 2017. The court was therefore entitled to rely on its prior competency finding. (See *Rodas*, *supra*, 6 Cal.5th at pp. 234-235 ["when faced with evidence of relatively minor changes in the defendant's mental state, the court may rely on a prior competency finding rather than convening a new hearing to cover largely the same ground"].)

### b. Dr. Knapke's 2019 Report Revealed No Substantial Change in Circumstances

Bennett nominally argues that Dr. Knapke's 2019 report revealed a substantial change in circumstances from those existing in 2017, but he makes no attempt to adduce any changed

18

circumstance. On the contrary Bennett supports this argument with evidence of only *un*changed circumstances, for example, "that appellant has had consistent symptoms of paranoia and delusions since years prior to the incident."

Bennett likens himself to the defendant in *Rodas*, who was entitled to a new competency hearing after he expressed paranoia, discussed Biblical characters, and started speaking incoherently following cessation of medication. (*Rodas*, *supra*, 6 Cal.5th at p. 231.) *Rodas* is distinguishable.

There, the defendant had a history of diagnosed schizophrenia and substance abuse and had been declared incompetent to stand trial and confined at a psychiatric facility. An expert reported that if he took psychotropic medication, the defendant "likely would regain competence, but without it, likely would not." (*Rodas*, *supra*, 6 Cal.5th at p. 232.) Our high court concluded circumstances had so deteriorated when the defendant went off his medication and began speaking in what counsel described as a "word salad," i.e., " 'polysyllabic words that go around in a circle and don't really make sense' " (*id.* at p. 227), that the trial court erred in not holding a new competency hearing. (*Id.* at pp. 236-237.) Bennett identifies no material change in his behavior subsequent to the 2017 competency finding remotely comparable to that in *Rodas*. There being no evidence casting serious doubt on the court's 2017 finding that Bennett was competent to stand trial, and no substantial change in circumstances since that finding, we see no basis for second guessing the court's judgment in declining to order a second competency hearing.

## B. Instruction on Heat of Passion Voluntary Manslaughter

Bennett contends the trial court erred in failing to instruct on heat of passion voluntary manslaughter.

We disagree.

### 1. Legal Principles

#### a. Homicide Categories

Homicide is divided into murder, which requires malice aforethought, and manslaughter, which does not. (*People v. Beltran* (2013) 56 Cal.4th 935, 941.)

A killing without malice but induced by a sudden quarrel or heat of passion is voluntary manslaughter, a lesser included offense of murder. (*People v. Williams* (1988) 199 Cal.App.3d 469, 475; *People v. Lasko* (2000) 23 Cal.4th 101, 108.)

Voluntary manslaughter on a heat of passion theory has both subjective and objective components. (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).) "To satisfy the subjective element . . . , the accused must be shown to have killed while under 'the actual influence of a strong passion' " induced by the victim's provocation. (*Id.* at p. 550.) The passion aroused may be any " ' " 'violent, intense, high-wrought or enthusiastic emotion' " ' [citations] other than revenge." (*People v. Breverman* (1998) 19 Cal.4th 142, 163 (*Breverman*), disapproved on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7 (*Schuller*).)

To satisfy the objective element, the heat of passion must be a result of sufficient provocation—that is, conduct by the victim "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due

deliberation and reflection." (*Moye, supra,* 47 Cal.4th at pp. 549-550.) "To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react,* without reflection." (*People v. Beltran, supra,* 56 Cal.4th at p. 949.) Both heat of passion and adequate provocation "must be affirmatively demonstrated." (*People v. Lee* (1999) 20 Cal.4th 47, 60.)

Malice aforethought may also be negated by an actual but unreasonable belief in the need to defend oneself or another from imminent danger of death or great bodily injury, reducing a killing from murder to voluntary manslaughter. (*People v. Randle* (2005) 35 Cal.4th 987, 990, 994, overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) This doctrine is commonly known as imperfect self-defense or defense of another. (*Randle,* at p. 994.) Self-defense against an assault requires an actual and reasonable belief in the need to defend against an imminent danger of bodily injury. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) The trier of fact "must consider what 'would appear to be necessary to a reasonable person' " in the position of appellant, with the appellant's knowledge and awareness. (*Id.* at pp. 1082-1083.)

### b.    Jury Instruction

A trial court must instruct on general principles of law relevant to the issues raised in a criminal case. (*Breverman, supra* 19 Cal.4th at p. 162.)

But "the court is not obliged to instruct on theories that have no such evidentiary support." (*Breverman, supra,* 19 Cal.4th at p. 162.) The "existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense,

but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.  [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude" ' that the lesser offense, but not the greater, was committed."  (*Ibid*.)

We review de novo a trial court's failure to instruct on a lesser included offense, viewing the evidence in the light most favorable to the defendant.  (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

When there is substantial evidence of heat-of-passion manslaughter, the trial court's failure to instruct on that theory precludes the jury from making a factual finding that is necessary to prove the malice element of murder.  The error therefore amounts to a violation of the federal Constitution and is subject to the "beyond a reasonable doubt" standard for evaluating prejudice.  (*Schuller*, *supra*, 15 Cal.5th at p. 260, fn. 7.)

### 2.    Application

Whether the trial court erred in failing to instruct the jury on a heat-of-passion theory turns on whether the record contains substantial evidence that, if believed by the jury, would raise a reasonable doubt as to whether Bennett was aroused to passion, and his reason was thus obscured, by a provocation sufficient to produce such effects in a person of average disposition.  (See *Breverman*, *supra*, 19 Cal.4th at pp. 163-164.)

Here, there was no evidence that Bennett acted while under the actual influence of any "violent, intense, high-wrought or enthusiastic emotion" when he stabbed Tyler.  (*Breverman*,

*supra*, 19 Cal.4th at p. 163.) Granted, Bennett testified that Tyler punched him in the head, hit him again four or five times, called him a "stupid motherfucker" and, after he hit her back, "drew" a knife, but Bennett did not say that Tyler attacked him with the knife or that her actions up to this point caused him to feel any particular emotion.

Bennett testified that after he wrestled Tyler to the ground and took the knife away, she got on top of him and attempted to gouge at his eyes, and he was "fearful" that she would do so. He therefore stabbed her to "get her off" him. Bennett did not testify he experienced any violent, intense, high-wrought or enthusiastic emotion, and no evidence showed that he did.

We grant that Tyler's attack when she and Bennett were on the ground (he with the knife) was "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection" (*Moye, supra*, 47 Cal.4th at p. 550), even though she was unarmed and even though Bennett sustained no injuries. But no evidence suggested Bennett was actually provoked to act rashly or without due deliberation. (See *ibid.* ["To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation"].) For example, nothing suggested his reason was obscured or he panicked or lost control. On the contrary, Bennett admitted he stabbed Tyler deliberately because he was unable to dislodge her and feared she would injure or kill him. (Cf. *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 649 [" 'anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene' "].)

23

We conclude no substantial evidence raised a reasonable doubt that Bennett stabbed Tyler in a heat of passion. The court therefore properly declined to give a heat of passion instruction.

## C.     Prosecutorial Misconduct

Bennett argues the prosecutor committed prejudicial misconduct by arguing to the jury that Bennett "sat for six years, seven months and 14 days on the fact that he was attacked allegedly by Cheryl Tyler." He argues that the prosecutor thus used his silence as substantive evidence of guilt, which violated his Fourteenth Amendment right to due process. In a related vein, Bennett argues the prosecutor committed misconduct by arguing that Bennett "told no one that Cheryl Tyler had allegedly attacked him. . . . [H]e told absolutely no one that she attacked him," even though the prosecutor knew that (1) Dr. Markman reported that Bennett had stated that on the date of the incident he was "afraid of being stabbed with a knife—roommate was yelling and screaming—thought she was attacking me"; and (2) Dr. Knapke reported that Bennett "believed that the victim was trying to kill him . . . and . . . described her as being very hostile towards him on the day of the instant offense. At one point, the victim knocked the knife out of his hand[,] and he then retrieved it and stabbed the victim multiple times."

### 1.     Relevant Proceedings

Responding to a reported disturbance, police found Bennett standing alone in his apartment complex's second-floor courtyard. He responded to some questions but not others. For example, he motioned to his waistband when asked whether he had a weapon

24

but said nothing when asked whether he lived in the complex and in which apartment.

Prior to booking Bennett, police placed him in a holding jail cell in a police station. Three detectives tried to interview him in the holding cell, but he lay down with his eyes closed and did not respond to any questions.

During cross-examination, the prosecutor asked Bennett, "Who was the first person that you told about Cheryl Tyler attacking you and trying to gouge out your eyes?" The court sustained defense counsel's objection that that question would theoretically force Bennett to reveal he told his attorney Tyler attacked him, which would violate Bennett's attorney-client privilege. The prosecutor rephrased the question, asking, "Who was the first person, other than any of your attorneys, that you told about Cheryl Tyler trying to gouge your eyes out?" After the court overruled defense counsel's objections on the grounds that the question assumed facts not in evidence and the answer would be unduly prejudicial under Evidence Code section 352, Bennett responded, "I don't remember. I don't know."

Prior to argument, the trial court asked if defense counsel wanted to lodge an objection regarding any comment on Bennett's post-arrest, pre-*Miranda*[3] silence. Counsel stated: "Yes, your Honor. So it's my understanding that Mr. Ford intends to comment on that in some way. I believe that would be a violation of my client's 5th Amendment right to remain silent. And to comment on it I know that the prosecution is not allowed to comment on such things. And I would submit on that, but this is for the record." The trial court overruled the objection.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

25

During closing argument, the prosecutor told the jury: "We know the defendant told no one that Cheryl Tyler had allegedly attacked him." "[H]e told absolutely no one that she attacked him. The evidence shows us silence. And sometimes what someone doesn't say is just as important as what they do. He told no one about this except his attorney until you fin[e] folks heard [it]. [T]his man sat for six years, seven months and 14 days on the fact that he was attacked allegedly by Cheryl Tyler." Defense counsel objected and requested a sidebar. During the sidebar, the following discussion ensued:

"[Defense counsel]: I believe [the prosecutor] said that he did [not] tell anyone except his attorney.

"[Prosecutor]: I said[, ']maybe her [sic] attorney.[']

"[Defense counsel]: That's not evidence. I specifically made the objection for attorney-client privilege.

"The court: And I sustained it to my knowledge.

"[Prosecutor]: Then I asked the follow-up question[,]

['E]xcepting your attorney, did you tell anyone else[?'] And he said[, ']I don't know.[']

"The court: The objection is overruled. And I will give an admonishment to the jury. Thank you."

Then, back in open court, the court gave an admonishment to the jury: "All right. Ladies and gentlemen, once again . . . the statement of the attorneys is not evidence. Are you to abide by your recollection of the facts and evidence presented during the case and abide by [the] court's instructions regarding application of the jury instruction."

### 2.    Prejudice

We will assume for the sake of argument that the prosecutor inappropriately used Bennett's silence during a custodial interrogation as evidence of guilt and mischaracterized the facts by arguing Bennett never told anyone that Tyler attacked him.  We discern no prejudice.

A prosecutor's misconduct is prejudicial if " 'it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 679.)

Bennett admitted he killed Tyler and, as discussed above, no evidence suggested he did so in a heat of passion.  Bennett testified that Tyler punched him in the head, hit him again four or five times, called him a "stupid motherfucker" and, after he hit her back, "drew" a knife.  He did not testify that Tyler attacked him with the knife.  Bennett testified that he took the knife away and wrestled Tyler to the ground, but she somehow got on top of him and threatened to gouge out his eyes.  He testified that fearing she would injure or kill him, he deliberately stabbed Tyler to dislodge her.  His theory was imperfect self-defense.

It is not reasonably probable that without the prosecutor's alleged misuse of Bennett's silence while in custody and mischaracterization of the evidence the jury would have accepted Bennett's self-defense theory.  The only facts pertinent to that theory were that after Bennett obtained control of the knife, Tyler got atop him, he feared she would gouge out his eyes, and he could not dislodge her without stabbing her 14 times.  Whatever negative inference the jury drew from the prosecutor's misrepresentation that Bennett never told this story before trial was dwarfed by the unlikelihood that a 44-year-old man who was

able to disarm a 63-year-old woman with limited mobility (she used a walker and a cane) and "take" her to the ground actually believed he needed to stab her 14 times to dislodge her from atop him.

Accordingly, if an error occurred, it was harmless beyond a reasonable doubt.

## D.     Cumulative Error

Bennett contends the cumulative error that occurred during trial compels reversal.  Consistent with our review of his individual claims, we find no cumulative error occurred.  (*People v. Ochoa* (2001) 26 Cal.4th 398, 458.)

## E.     *Pitchess* Hearing

*Pitchess* motions have been used to screen law enforcement personnel files in-camera for evidence potentially relevant to a criminal defendant's defense.  (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019.)  Where the defendant has shown good cause, the trial court holds an in-camera hearing to determine whether the evidence should be disclosed to the defense.  (*Ibid.*)

Bennett sought discovery pursuant to *Pitchess*, asking whether there was discoverable information in the files of the testifying police officers, Detective Kouri, Detective Villarreal, and Officer Estrada.  The trial court held in-camera hearings, after which it ordered the files sealed and disclosed one complaint to Bennett, subject to a protective order.

Bennett requests that we review the in-camera proceedings to determine whether the trial court incorrectly withheld any discovery pertaining to the testifying officers when it denied his *Pitchess* motion.

We may do so by reviewing a transcript of the in-camera proceedings.  (*People v. Prince* (2007) 40 Cal.4th 1179, 1286.)  We review a trial court's decision on the discoverability of material in police personnel files for an abuse of discretion.  (*Ibid.*)

Here, the record is adequate to permit meaningful appellate review.  It includes a full transcript of both segments of the in-camera hearing, where the court adequately stated for the record the contents of the three officers' personnel files, which were supplied and certified by the LAPD's custodian of records.  The court stated its reasoning for finding that Bennett was entitled to only one of the complaints that had been filed against one of the officers.  (See *People v. Prince*, *supra*, 40 Cal.4th at pp. 1285-1286 [in some circumstances it suffices for the court to state for the record what documents it examined].)

We have reviewed the record under seal and independently conclude that the trial court did not abuse its discretion in its ruling upon the *Pitchess* motion.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.          BENDIX, J.